UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

JORDYN R. MCDONALD, INDIVIDUALLY AND     PLAINTIFFS
AS PARENT AND STATUTORY GUARDIAN ON
BEHALF OF T.A., MINOR

vs.     NO. 3:20-CV-391-CRS

DNA DIAGNOSTICS CENTER, INC., *et al.*     DEFENDANTS

## MEMORANDUM OPINION

This matter is before the Court on Plaintiffs' motion to amend their complaint under Federal Rule of Civil Procedure 15(a)(2). DN 13. Plaintiff Jordyn R. McDonald ("McDonald"), individually and in her capacity as parent and statutory guardian of T.A., a minor, requests the Court's leave to amend the original complaint to add a negligence claim against Defendants Natera, Inc. ("Natera") and DNA Diagnostics Center, Inc. ("DNA Diagnostics") (collectively "Defendants"). Natera responded, DN 22, and DNA Diagnostics moved to join Natera's response. DN 24. Plaintiffs replied. DN 27. The matter is now ripe for adjudication. For the following reasons, Plaintiffs' motion will be denied.

### I. BACKGROUND

McDonald, individually and in her capacity as parent and statutory guardian of T.A., a minor, brought this action against Defendants DNA Diagnostics and Natera, "two entities involved in genetic testing," as well as Cicily Muhammad, an employee of DNA Diagnostics, concerning an alleged erroneous paternity test. DN 8-1 at 1. In 2014, McDonald, who was pregnant at the time, alleges she contracted with Defendants for a paternity test to determine whether Eric J. Ralston ("Ralston"), Plaintiff's then-boyfriend, was the father of the child. DN 1-1 ¶ 10. The test results reported that Ralston was not the father, and, as a result, McDonald states that she and

1

Ralston ended their relationship. *Id.* ¶¶ 12–13. In the intervening years between 2014 and 2017, subsequent paternity tests ruled out two other past boyfriends as being the father. *Id.* ¶¶ 22–26. However, in 2017, as the complaint states, Ralston agreed to another paternity test after seeing photographs of T.A. and noticing a physical resemblance. *Id.* ¶ 36. This time, Plaintiffs claim, the 2017 results showed that Ralston was in fact the father, which was confirmed again by yet another paternity test in 2019. *Id.* ¶¶ 37, 43.

The complaint alleges that the initial erroneous paternity test and ensuing confusion caused McDonald to suffer severe depression, have suicidal thoughts, and "emotionally abandon[] T.A. for a time." *Id.* ¶¶ 29–30. Plaintiffs also allege that T.A.'s relationship with his father will never be what it could have been had his parents not split up after receiving the incorrect paternity test results, *Id.* ¶ 44, and that his relationship with his mother will be "forever marred by her emotional distress and temporary emotional abandonment of him." *Id.* ¶ 45. The proposed amended complaint claims that, as a result of Defendants' alleged negligence in reporting inaccurate test results, Plaintiffs "were caused to suffer injury both mental and physical." DN 13-2 ¶ 56. Further, it alleges, "Such emotions and resentment are emotionally unhealthy for Jordyn and present a physical and emotional risk for and do not bode well for the Plaintiff T.A., Minor." *Id.* ¶ 58.

McDonald commenced the present action in Kentucky state court on April 28, 2020, individually and on behalf of T.A., alleging fraudulent misrepresentation, loss of parental consortium, and a claim for punitive damages. DN 1-1. Defendants removed the case to federal court. DN 1. Plaintiffs have since moved to voluntarily dismiss T.A.'s loss of parental consortium claim, DN 15, but now seek to amend the complaint to include a negligence claim on behalf of both Plaintiffs. DN 13-2 ¶¶ 54–58. Defendants oppose Plaintiffs' proposed amendment on the

ground that neither Plaintiff's negligence claim could survive a motion to dismiss, making the amendment futile. DN 22 at 2; DN 24 at 1–2.

## II. DISCUSSION

### A. Legal Standard for Rule 15 Motion to Amend

Under Federal Rule of Civil Procedure 15(a), a party may amend its complaint as a matter of right within 21 days after serving the complaint or "if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason . . . the leave sought should, as the rules require, be 'freely given.'").

However, futility of the amendment is one basis upon which a court may deny a motion to amend. *See Benzon v. Morgan Stanley Distribs.*, 420 F.3d 598, 613 (6th Cir. 2005). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000). Therefore, when a party opposes an amendment based on futility, a court will apply the Rule 12(b)(6) standard in making the futility determination. *See, e.g.*, *Sims v. Atrium Med. Corp.*, 349 F. Supp. 3d 628, 644 (W.D. Ky. 2018).

A decision to dismiss under Rule 12(b)(6) is based "purely on the legal sufficiency of plaintiff's case: even were plaintiff to prove all its allegations he or she would be unable to prevail." *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996) (quoting *Mortensen v. First Federal Savings and Loan Ass'n*, 549 F.2d 884, 890 (3d Cir. 1977)). To survive

3

a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* "[A] district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009). "But the district court need not accept a bare assertion of legal conclusions." *Id.* (internal quotation marks omitted). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted).

### B. Plaintiff McDonald's Individual Negligence Claim

Defendants argue that Plaintiff McDonald's negligence claim is time-barred under Kentucky's one-year statute of limitations for negligence claims. DN 22 at 3; Ky. Rev. Stat. § 413.140(1)(a). Defendants are correct. Since Defendants' alleged negligence would not have been immediately evident at the time of the initial paternity test in 2014, the one-year period did not begin to run until the date "the plaintiff discover[ed] (or in the exercise of reasonable diligence should have discovered) not only that [she] has been injured, but also that this injury may have been caused by the defendant's conduct." *Fluke Corp. v. LeMaster*, 306 S.W.3d 55, 60 (Ky. 2010) (internal quotation marks and citation omitted). This means that the one-year limitations period on McDonald's negligence claim began to run January 12, 2017, the date when she claims to have received the results from Ralston's second paternity test indicating for the first time that he was in fact the father of T.A. *See* DN 1-1 ¶ 37. It was at this point that McDonald should have discovered

4

that the 2014 test results were inaccurate and that the mistake may have been caused by Defendants' conduct.[1] Therefore, since Plaintiff did not file the instant action until April 28, 2020, her claim is outside the one-year limitations period.

In her reply, Plaintiff states that Defendants' statute of limitations argument is a "red herring" because she "has already asserted her lawful and timely allegation of fraud against [Defendants]." DN 27 at 2. Therefore, she argues, "Lesser 'negligence' need not be alleged separately." *Id.* First, Plaintiff *does* allege her negligence claim separately; that is the point of the instant motion: to amend the complaint to include a separate allegation of negligence in addition to her claim for fraudulent misrepresentation. Second, the fact that her fraud claim is not time-barred has no effect on the limitations period for a negligence claim. The Kentucky legislature provided a longer limitations period for fraud claims than for negligence claims. *Compare* Ky. Rev. Stat. Ann. § 413.120(11), *with* § 413.140(1)(a). Plaintiff states that she "is not seeking to amend her claim 'down' to negligence from fraud." DN 27 at 2. This is correct. She seeks to amend the complaint to add a claim for negligence, a separate, alternative theory of liability that comes with a separate, shorter limitations period.

Accordingly, allowing McDonald to amend her complaint to add a negligence claim in her individual capacity would be futile because the claim is time-barred.

### C. Plaintiff T.A.'s Negligence Claim

As for T.A.'s negligence claim, the parties debate whether Defendants owed a duty of care to T.A., who was unborn at the time of the alleged negligence. *See* DN 22; DN 27. Whether a duty of care exists is a question of law to be decided by the court. *Pathways, Inc. v. Hammons*,

---

[1] The conclusion that McDonald knew the 2014 results were inaccurate is further reinforced by the fact that she initiated a child support action against Ralston after receiving the 2017 results. DN 1-1 ¶¶ 40, 41. Ralston's third paternity test in 2019, which confirmed the 2017 results, was ordered by the judge presiding over the child support action. *Id.* ¶¶ 41–43.

113 S.W.3d 85, 89 (Ky. 2003). No Kentucky courts, nor federal courts interpreting Kentucky law, have addressed the issue of whether a duty of care is owed in a case of erroneous paternity test results, let alone whether that duty extends to the child whose paternity is the subject of the test, born or unborn. The legal question, therefore, is one of first impression in Kentucky. For the Court to rule on this issue, "[t]he state court need not have addressed the exact question, so long as well-established principles exist to govern a decision." *State Auto Prop. & Cas. Ins. Co. v. Hargis*, 785 F.3d 189, 194 (6th Cir. 2015). Here, Kentucky's negligence law is a well-established basis upon which to render a decision on the issue of duty in this case. "When the state's highest court has not spoken on the issue, the federal court is called upon to predict what that court would do if confronted with the question." *Id.* at 195 (citing *Berrington v. Wal-Mart Stores, Inc.*, 696 F.3d 604, 608 (6th Cir. 2012); *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 577 (6th Cir. 2004)). This prediction should be based upon "all the available data," including "the decisions (or dicta) of the Kentucky Supreme Court in analogous cases, pronouncements from other Kentucky courts, restatements of law, commentaries, and decisions from other jurisdictions." *Id.*

Defendants argue that since T.A. was not born at the time of the alleged negligence, no independent duty was owed to him by Defendants under Kentucky law. DN 22 at 4. In support of its argument, Defendant Natera cites the Kentucky Supreme Court case *Grubbs v. Barbourville Family Health Ctr., P.S.C.*, 120 S.W.3d 682 (Ky. 2003). In that case, the court granted review of two consolidated cases. In each, a child who was born with serious birth defects and its parents brought suit against healthcare providers who did not timely inform the parents of the probability of the birth defects, thereby denying them the opportunity to terminate the pregnancies. *Grubbs*, 120 S.W.3d at 685–86. Whether the parents' claims for "wrongful birth" or the children's claims for "wrongful life" constituted valid causes of action were issues of first impression in Kentucky.

*Id.* at 684. The Kentucky Court of Appeals held that a claim for wrongful birth could satisfy the elements of negligence and, therefore, was a valid claim, but that the wrongful life claim failed because "there is no separate, independent duty owed by a physician to an unborn child apart from the duty owed to the mother." *Id.* at 687. However, the Kentucky Supreme Court refused to acknowledge either claim, holding that the loss of an abortion opportunity, or, likewise, the birth of a child, even one with incurable birth defects, is not a "cognizable legal injury." *Id.* at 689–90. The lower court decision was reversed without ever addressing the issue of whether a duty was owed to an unborn child to accurately and timely inform its parents of potential birth defects. The Court's reasoning was instead based solely on the failure of the injury element of the negligence claims. *See id.* Therefore, contrary to Defendants' assertion, *Grubbs* does not stand for the general proposition that Kentucky law does not recognize a duty of care to an unborn child.

Plaintiffs argue that, due to the structure of Kentucky law, which affords legal rights to unborn children in certain contexts, Defendants must have owed a duty to McDonald's unborn child at the time of the 2014 paternity test. DN 27 at 8. Plaintiffs discuss a variety of areas of law in which Kentucky has acknowledged certain rights of unborn children. DN 27 at 8–11. Examples include Kentucky's fetal homicide statute, and a prohibition against withdrawing life support from a pregnant woman. Ky. Rev. Stat. Ann. §§ 507A.010–.060, 311.625. Plaintiffs also point to statutes that create inheritance rights for unborn children, such as laws relating to posthumous and pretermitted children. *Id.* §§ 391.070, 394.382. In addition, Plaintiffs call attention to the fact that unborn children have property rights beyond what is provided for in inheritance statutes, stating, "Kentucky . . . permits a *guardian ad litem* to be appointed to protect and represent property interests of an unborn child." DN 27 at 11; Ky. Rev. Stat. Ann. § 389A.035. Finally, in the realm of tort law, Plaintiffs highlight the Kentucky Supreme Court case *Mitchell v. Couch*, which held

7

that the state's constitutional and statutory provisions that allow for recovery in wrongful death cases also allow the estate of an unborn child to recover if the fetus was viable at the time of injury because a viable fetus is a "person" within the meaning of the constitutional and statutory provisions. *Mitchell v. Couch*, 285 S.W.2d 901, 906 (Ky. 1955).

Plaintiffs argue that the existence of a duty of care in the present case may be deduced from the above examples in which Kentucky has afforded rights to unborn children. DN 27 at 8. The examples do illustrate that there is nothing inherent in the mere fact that a child is unborn that prevents the child from having certain cognizable rights. Further, although *Mitchell*'s holding is narrow in the sense that it only allows for recovery for the wrongful death of a viable unborn child, the broader implication is that unborn status alone does not negate the existence of a duty of care in Kentucky law. At the turn of the twentieth century, mother and unborn child were considered "but one person" at common law, preventing recovery in tort for injuries to the unborn child. *See* Gregory J. Roden, *Prenatal Tort Law and the Personhood of the Unborn Child: A Separate Legal Existence*, 16 St. Thomas L. Rev. 207, 212 (2003). Kentucky joined a growing number of states in rejecting the common law rule with the *Mitchell* decision. In discussing the trend in other jurisdictions toward allowing for recovery for prenatal injuries, *Mitchell* notes, "All writers who have discussed the problem have joined in condemning the existing rule, in maintaining that the unborn child in the path of an automobile is as much a person in the street as the mother, and urging that recovery should be allowed upon proper proof." 285 S.W.2d at 905 (quoting William L. Prosser, *Handbook of the Law of Torts* 190 (1941)).

Although the existence of a duty of care is not automatically ruled out based on unborn status, this does not thereby mean that a duty to the unborn child does in fact exist in all cases where negligent conduct injures an unborn child. Absent a statutorily imposed duty, any duty

owed to the child would have to arise from common law negligence principles. For instance, "'universal duty of care,' has no meaning in Kentucky jurisprudence beyond the most general expression of negligence theory, and certainly none absent a relational context as evidenced by the circumstances of each case." *Jenkins v. Best*, 250 S.W.3d 680, 691 (Ky. Ct. App. 2007). Circumstances must give rise "to a relationship of some kind in which one particular party owed a duty to another particular party." *Id.* Given the proper relational context is satisfied, "the scope and character of a defendant's duty is largely defined by the foreseeability of the injury." *Lee v. Farmer's Rural Elec. Coop. Corp.*, 245 S.W.3d 209, 212 (Ky. Ct. App. 2007); *see also Pathways, Inc.*, 113 S.W.3d at 89 ("The most important factor in determining whether a duty exists is foreseeability." (internal quotation marks and citation omitted)). To determine the foreseeability of an injury, Kentucky courts "look to whether a reasonable person in a defendant's position would recognize undue risk to another, not whether a reasonable person recognized the specific risk to the injured party." *Lee*, 245 S.W.3d at 213.

In this case, Plaintiffs claim the alleged injury resulted from a negligently performed paternity test. Much can hinge on the outcome of these tests. For example, such tests are often used to determine legal rights and obligations in the family law context. *See Perry v. Commonwealth*, 652 S.W.2d 655, 660 (Ky. 1983) ("Blood tests are the most reliable source for the truth in paternity cases."). The importance of reliable testing in these situations is widely recognized by courts. *See Little v. Streater*, 452 U.S. 1, 7 (1980). Likewise, paternity testing may also bear on one's right to inherit under the laws of intestacy. *See Harris v. Stewart*, 981 S.W.2d 122 (Ky. Ct. App. 1998) (holding statute that requires "adjudication of paternity after the death of the father based upon clear and convincing proof" before children born out of wedlock may inherit from putative father is constitutional). These observations alone make it foreseeable that a

negligently performed paternity test creates a risk of injury to those whose rights, either presently or in the future, may depend on an accurate paternity determination. Even if a specific injury that one may suffer as the result of an erroneous paternity test was not apparent at the time of testing, a reasonable person would foresee that a duty of care arises to any person, born or unborn, who would be affected by the reported results. Such a duty would include a duty to exercise reasonable care to ensure accuracy.

In *Berman v. Lab Corporation of America*, the Supreme Court of Oklahoma held that a duty of care was owed to the plaintiff mother to perform paternity testing accurately. 268 P.3d 68, 72 (Okla. 2011). In that case, the test was ordered by a court in the course of a paternity action. *Id.* at 69. This fact figured prominently in the court's reasoning:

> The importance of reliable and accurate DNA test results cannot be overstated. This type of forensic evidence is becoming part of our jurisprudence, and this trend is not likely to end. Much stands in the balance of the lives of those relying on such test results to protect their legal rights in a court of law. Inaccurate results could deal a devastating blow to those who otherwise have no ability to prove their cases on their own. Without recourse against a negligent defendant, a plaintiff has no remedy. Berman stands in that position in her relationship with LabCorp. Inaccurate results proved fatal to her case in her DHS proceeding. She was forced to pursue further legal action at her own expense. Her risk was foreseeable, and LabCorp owed her a duty to prevent that risk of harm.

*Id.* at 72. In *Berman*, the mother alone brought the negligence action against the testing company. *Id.* at 69. Thus, whether the duty also extended to the plaintiff's child was not at issue. However, we believe that a child, born or unborn, suffers a risk of injury in ways similar to the mother if a paternity test is performed negligently.

The Court of Appeals of Tennessee's decision in *Miller v. Niblack* is instructive. 942 S.W.2d 533 (Tenn. Ct. App. 1996). In that case, the mother brought an action against a testing company on behalf of herself and her daughter for damages caused by an erroneous paternity test. *Id.* at 535. The father had since passed away, and the plaintiffs claimed the daughter was deprived

10

of six months of social security benefits that she would have received as a result of her father's death had the paternity test not been performed negligently. *Id.* at 541. The court rejected the defendant's argument that the plaintiff daughter did not suffer actionable damages and allowed the claim to proceed as to the social security benefits.[2] *Id.* This implies the court saw no issue relating to the existence of a duty of care owed to the daughter, nor did the defendant make the argument. If we apply the above analysis for relational context and foreseeability, the reason is clear in the abstract, if not explicitly in *Miller*. The unique nature of paternity testing creates a cognizable relationship between the child, whose paternity is the subject of the test, and the testing company because the child is at risk of injury if the testing company acts negligently. The relationship and foreseeability of injury create a duty. As in the daughter's case in *Miller*, loss of social security benefits that are conditioned on establishment of paternity is an injury of the type that may foreseeably occur if the test is performed negligently.

We highlight the fact that the daughter in *Miller* was already born at the time of the paternity test alleged to have caused the plaintiffs' damages. However, we see no reason why the same result should not obtain in a case where the child is still in the womb at the time of testing, because the risk of injury is no less foreseeable. And as noted above, Kentucky law would not categorically preclude recovery based on mere unborn status. Therefore, the unborn status of a child in a case of negligently performed paternity testing is not a relevant factor in determining whether a duty of care is owed to the child. Wrongful death cases are different. Unborn status is a relevant but not controlling consideration in those cases because of the nature of the injury. A fetus may be unborn but not viable. According to *Mitchell*, a duty arises because negligent conduct creates a foreseeable risk of death to a "person" if the unborn child is viable. *See Baxter v. AHS*

---

[2] However, the court held that the daughter's claim for "loss of enjoyment of life," which the plaintiffs argued related to "loss of the parent-child relationship," was not a compensable injury. *Miller*, 942 S.W.2d at 542, 542 n.6.

*Samaritan Hosp., LLC*, 328 S.W.3d 687, 693 (Ky. Ct. App. 2010) (citing *Mitchell* in holding child's estate could not bring wrongful death action because he was not viable at time of death). However, due to the nature of paternity testing and the types of injuries that may result from negligence in those situations, unborn status, let alone viability, does not factor into the duty analysis as it does in wrongful death cases.

In view of the above discussion, the defendants in this case owed a duty of care to those whose rights depended on the outcome of the paternity test. Here, T.A. is included in that class of persons. However, successfully establishing the existence of a duty of care alone is insufficient to survive a motion to dismiss. *See Means v. United States Conference of Catholic Bishops*, 836 F.3d 643, 652 (6th Cir. 2016) (dismissing negligence claim since, even if duty existed, plaintiff did not allege cognizable injury). Any negligence claim "requires proof that (1) the defendant owed the plaintiff a duty of care, (2) the defendant breached the standard by which his or her duty is measured, and (3) consequent injury." *Pathways*, 113 S.W.3d at 88. In this case, T.A.'s alleged injuries either do not meet the minimum pleading standards set forward in *Iqbal* or are not cognizable injuries in Kentucky.

Plaintiffs allege that T.A. was "caused to suffer injury both mental and physical," DN 13-2 ¶ 56, but the allegation of physical injury is a "naked assertion devoid of further factual enhancement," as there is no factual underpinning in the complaint to support a claim of physical injury. *See Iqbal*, 556 U.S. at 678 (internal quotation marks and citation omitted); *see generally* DN 13-2. As for the "mental" injury, the Court assumes this refers to the statements in the complaint regarding the effect the alleged erroneous paternity test will have on T.A.'s relationship with his parents, since nothing else in the complaint addresses a mental injury of T.A. *See generally* DN 13-2. Plaintiffs state that T.A.'s relationship with his father will never be what it

12

could have been had his parents not split up after receiving the incorrect paternity test results, and that his relationship with his mother will be "forever marred by her emotional distress and temporary emotional abandonment of him." DN 13-2 ¶¶ 41–42. These statements are essentially the same as Plaintiffs' claim that T.A.'s relationship with his [parents] will never be the same and he has suffered a loss of parental consortium." DN 13-2 ¶¶ 30–31. *Guiliani v. Guiler* first recognized the claim of loss of parental consortium in Kentucky as "a remedy for those children who lose the love and affection of their parents due to the negligence of another." 951 S.W.2d 318, 319 (Ky. 1997). However, the Court of Appeals of Kentucky has since held that the claim is limited to cases of wrongful death only. *Lambert v. Franklin Real Estate Co.*, 37 S.W.3d 770, 780 (Ky. Ct. App. 2000). This is likely the reason Plaintiffs moved to amend their complaint to replace the "loss of consortium claim with an allegation of general negligence." DN 15 at 1. However, although Plaintiffs now attempt to assert a negligence claim, the alleged injury remains the same as it was under the loss of consortium claim. If the loss of consortium claim was not valid as a stand-alone claim, it does not become valid when plead as an injury in the context of a negligence claim. Therefore, Plaintiffs' assertion that Defendants' conduct "caused [T.A.] to suffer injury both mental and physical" fails the "injury" element of the negligence claim. *See* DN 13-2 ¶ 56.

The other statements in the complaint that could be construed as injuries of T.A. likewise fail. The proposed amended complaint states, "Such emotions and resentment are emotionally unhealthy for Jordyn and present a physical and emotional risk for and do not bode well for the Plaintiff T.A., Minor." *Id.* ¶ 58. This "risk" to T.A. presented by his mother's emotions and resentment is too remote and speculative an injury to justify imposing liability on Defendants and is not supported by any further factual enhancement in the complaint. *See Gill v. Burress*, 382 S.W.3d 57, 64 (Ky. Ct. App. 2012) ("Kentucky law allows a plaintiff to recover for damages only

where the fact of damage is reasonably certain."); Holmes v. Countrywide Fin. Corp., No. 5:08-CV-00205-R, 2012 U.S. Dist. LEXIS 96587, at *17 (W.D. Ky. July 12, 2012) ("[A]n increased threat of an injury that may never materialize cannot satisfy the injury requirement for [Kentucky].").

Likewise, in the proposed amended complaint, the "wherefore" clause that follows the claims of fraudulent misrepresentation and negligence states that Plaintiffs seek "compensatory damages including damages for the impairment/destruction of the Plaintiffs' power to labor and earn money" and "past and future medical expenses." DN 13-2 at 9. Other than this statement, the complaint nowhere asserts any facts concerning T.A.'s future inability to work or his medical expenses, nor any allegation that Defendant's negligent conduct caused these alleged injuries. Therefore, because Plaintiff T.A. has failed to adequately plead or sufficiently allege any cognizable injury, his negligence claim cannot survive a 12(b)(6) motion to dismiss. Accordingly, the proposed amendment would be futile.

### III. CONCLUSION

For the reasons discussed herein, Plaintiff's motion to amend, DN 13, will be denied by separate order.

October 30, 2020



Charles R. Simpson III, Senior Judge
United States District Court

14